No. 97-647

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 252

BALYEAT LAW, PC, as Trustee,

Plaintiff and Appellant,

v.

GEORGINA BEVERLY PETTIT,

Defendant and Respondent.

APPEAL FROM: District Court of the Twentieth Judicial District,

In and for the County of Lake,

The Honorable C. B. McNeil, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Regan Whitworth, Balyeat Law Offices, Missoula, Montana

For Respondent:

Andrea J. Olsen, Confederated Salish and Kootenai Tribes Tribal Legal Services, Pablo, Montana

Submitted on Briefs: February 18, 1998

Decided: October 20, 1998

No

Filed:

_____

Clerk

Justice William E. Hunt, Sr. delivered the Opinion of the Court.

¶ **Balyeat Law, P.C., as Trustee, (Balyeat) appeals from an order of the Twentieth Judicial District Court, Lake County, granting Georgina Beverly Pettit's (Beverly) motion to dismiss for lack of jurisdiction. We affirm.**

¶ **The following issues were raised on appeal:**

¶ **1. Did the District Court err when it addressed whether the Justice Court properly entered the default judgment and whether the state court had jurisdiction over this case?**

¶ **2. Do the state courts of Montana have subject matter jurisdiction over an action to collect a debt for medical bills arising out of transactions *on the Flathead Reservation*, brought by a non-Indian creditor against an enrolled member of the Confederated Salish and Kootenai Tribes who resides on the reservation and whose spouse incurred the debt?**

**¶ 3. Do the state courts of Montana have subject matter jurisdiction over an action to collect a debt for medical bills arising out of transactions that occurred *off the Flathead Reservation but within the State of Montana*, brought by a non-Indian creditor against an enrolled member of the Confederated Salish and Kootenai Tribes who resides on the reservation and whose spouse incurred the debt?**

## FACTUAL AND PROCEDURAL BACKGROUND

**¶ Beverly Pettit is an enrolled member of the Confederated Salish & Kootenai Tribes (Tribes). She has resided within the exterior boundaries of the Flathead Reservation her entire life. The record reveals that she works for Mission Valley Power, a business entity owned by the Tribes, and that all her assets are located on the reservation. On August 10, 1991, she married Lyle Pettit. Lyle is not a member of the Tribes, although he also lives within the exterior boundaries of the Flathead Reservation.**

**¶ Lyle incurred medical debts at three medical institutions: St. Luke Community Hospital (St. Luke's), Rittenour Medical Clinic, and Community Medical Center. St. Luke's is located in Lake County, within the exterior boundaries of the Flathead Reservation. Rittenour Medical Clinic is located in Sanders County, outside the exterior boundaries of the Flathead Reservation. The Community Medical Center is located in Missoula County, also outside the exterior boundaries of the reservation. Although the District Court made no findings of fact as to when the medical debts were incurred, it appears from the record that Lyle incurred some of his debts at St. Luke's in July 1989 and February 1991, prior to his marriage to Beverly. The remainder of the debts were incurred after his marriage. None of the medical debts were incurred by Beverly.**

**¶ All three medical institutions appointed Balyeat as trustee for Lyle's debts. On May 1, 1995, Balyeat filed a complaint in Lake County Justice Court alleging that Beverly was indebted to it for $1843.60 for goods and services provided to Lyle by the three medical institutions. Balyeat did not name Lyle as a defendant. On June 14, 1995, the Justice of the Peace entered a default judgment against Beverly for the requested sum plus interests and costs.**

¶ On January 17, 1996, Beverly filed a motion to set aside the default judgment, contending in part that the Lake County Justice Court had neither personal nor subject matter jurisdiction over her because she was a member of the Tribes residing within the exterior boundaries of the Flathead Reservation and because the debts were incurred by her husband Lyle both before and during their marriage. On February 27, 1996, the Justice of the Peace denied her motion without any opinion or rationale stated.

¶ Beverly appealed to the District Court on March 7, 1996, and on July 17, 1996, the District Court entered an order granting her motion to dismiss for lack of jurisdiction. The court did not support its order with any memorandum of opinion or rationale. Balyeat appealed to this Court. The record on appeal, however, was devoid of any affidavits, hearing testimony or discovery establishing what the facts actually were. Moreover, there was no memorandum of opinion or rationale of the court whose decision we were requested to affirm, modify or reverse. In light of the complexity and sensitivity of the issues involving state court jurisdiction over reservation Indians in civil matters, we thus remanded the case to the District Court with instructions to develop a factual record and render findings of fact, conclusions of law and a memorandum of opinion. We also instructed the parties on any further appeal of this case to this Court to cite and argue legal authorities that pertain to the specific factual record. See Balyeat Law, PC v. Pettit (1997), 281 Mont. 95, 931 P.2d 50.

¶ On August 27, 1997, the District Court entered its findings of fact, conclusions of law and order, granting Beverly's motion to dismiss for lack of subject matter jurisdiction. The court held that the issue of the state court's jurisdiction was properly before it, because the issue of the court's subject matter jurisdiction could be raised at any time. It applied the three-part test articulated in State ex rel. Iron Bear v. District Court (1973), 162 Mont. 335, 512 P.2d 1292 and held that the court did not have jurisdiction over the action because Beverly was a member of the Tribes and under Montana precedent, the exercise of state jurisdiction would interfere with reservation self-government. The court further held that the Tribes and the state of Montana had not agreed to concurrent jurisdiction over debt collection actions pursuant to Public Law 280. Finally, it held that § 40-2-106, MCA, did not subject Beverly to liability for Lyle's debts, because that statute did not confer jurisdiction which was otherwise precluded, and Beverly had not engaged in significant off-reservation contacts so as to render her subject to the jurisdiction of the state court

in this matter. This appeal followed. The case is now ready for review.

## STANDARD OF REVIEW

¶ **Whether to dismiss a claim based on lack of jurisdiction presents a question of law. We review a district court's conclusions of law to determine whether they are correct. In re Marriage of Skillen (Mont. 1998), 1998 MT 43, ¶ 9, 956 P.2d 1, ¶ 9 (citing Poteat v. St. Paul Mercury Ins. Co. (1996), 277 Mont. 117, 119, 918 P.2d 677, 679).**

## ISSUE ONE

¶ Did the District Court err when it addressed whether the Justice Court properly entered the default judgment and whether the state court had jurisdiction over this case?

¶ **Balyeat contends that the District Court had no authority to review whether the Justice Court properly entered a default judgment. It points to § 25-33-303, MCA, which provides that a party may not appeal a judgment by default rendered in justice court "except on questions of law which appear on the face of the papers or proceedings and except in cases when the justice's or city court has abused its discretion in . . . refusing to set aside a default or judgment." In this case, Balyeat argues that although Beverly raised the jurisdictional issue in her motion to set aside the default judgment, she identified nothing on the face of the complaint that indicates subject matter jurisdiction may be lacking. It further contends that she never actually argued that the Justice Court abused its discretion nor did she establish any evidence supporting such a claim. Balyeat maintains that the court therefore had no authority either to address the jurisdictional issue or set aside the default judgment. We disagree.**

¶ **It is well-settled that the issue of a court's subject matter jurisdiction may be presented at any time. See Rule 12(h)(3), M.R.Civ.P. ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.")(emphasis added). See also In re Marriage of Skillen, ¶ 10 ("A motion to dismiss based on lack of subject matter jurisdiction may be raised at any time and by either party, or by the court itself.");**

Geiger v. Pierce (1988), 233 Mont. 18, 21, 758 P.2d 279, 281("It is a fundamental axiom of our legal system that the issue of subject matter jurisdiction may be invoked at any time in the course of a proceeding.")(citing In re Marriage of Lance (1984), 213 Mont.182, 186, 690 P.2d 979, 981). This is true even if subject matter jurisdiction is not attacked until after the entry of default. <u>See</u>, e.g., Larrivee v. Morigeau (1979), 184 Mont. 187, 192, 602 P.2d 563, 566, <u>cert.</u> <u>den.</u>, 445 U.S. 964, 100 S.Ct. 1653, 64 L. Ed.2d 240. In short, a party can never waive or consent to subject matter jurisdiction where there is no basis for the court to exercise jurisdiction. <u>In re Marriage of Skillen</u>, ¶ 10 (citing In re Marriage of Miller (1993), 259 Mont. 424, 427, 856 P.2d 1378, 1380). Therefore, notwithstanding Balyeat's arguments that Beverly did not present the issue in the proper fashion or identify any legal issues on the face of the complaint, the issue of subject matter jurisdiction is not waived and the court cannot refuse to entertain the motion to dismiss. We hold that the District Court did not err when it considered the issue of the state court's jurisdiction and did not err in determining whether the Justice Court had properly entered the default judgment.

## ISSUE TWO

¶ Do the state courts of Montana have subject matter jurisdiction over an action to collect a debt for medical bills arising out of transactions on the Flathead Reservation, brought by a non-Indian creditor against an enrolled member of the Confederated Salish and Kootenai Tribes who resides on the reservation and whose spouse incurred the debt?

¶ Balyeat maintains that the state court has jurisdiction over that portion of the action that relates to the debts Lyle incurred at St. Luke's, which is located within the exterior boundaries of the reservation. In presenting this argument, Balyeat does not distinguish between those debts incurred by Lyle prior to his marriage to Beverly and those debts incurred after his marriage. It makes no difference in any event, because we hold that the state court lacks subject matter jurisdiction to resolve the dispute over all debts incurred at St. Luke's.

¶ It has long been recognized that tribes are presumed to maintain their inherent tribal sovereignty and jurisdiction over the activities of both Indians and non-Indians on reservation lands. Geiger v. Pierce (1988), 233 Mont. 18, 20, 758 P.2d 279, 280 ("Generally civil jurisdiction over commercial activities presumptively lies in the

tribal courts unless affirmatively limited by a specific treaty, provision or federal statute.")(citing Iowa Mutual Ins. Co. v. LaPlante (1987), 480 U.S. 9, 18, 107 S.Ct. 971, 978, 94 L.Ed.2d 10, 16); In re Marriage of Skillen, ¶ 56 ("As a matter of sovereignty, tribes are presumed to have jurisdiction over the activity of members and non-members alike within the exterior boundaries of the reservation.")

¶ In Williams v. Lee (1959), 358 U.S. 217, 223, 79 S.Ct. 269, 272, 3 L.Ed.2d 251, 255-56, the United States Supreme Court expressly held that in light of the tribes' inherent sovereignty, absent Congressional Acts, state courts do not have jurisdiction over debt actions brought by a non-Indian creditor, where the transaction at issue arose on the reservation. The Supreme Court stated:

> Essentially, absent governing Acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them.

Williams, 358 U.S. at 220, 79 S.Ct. at 271, 3 L.Ed.2d at 254. The Supreme Court concluded that "[t]here can be no doubt that to allow the exercise of state jurisdiction [in the debt action] would undermine the authority of the tribal courts over Reservation affairs and hence would infringe on the right of the Indians to govern themselves." Williams, 358 U.S. 223, 79 S.Ct. 272, 3 L.Ed.2d at 255. See also Kennerly v. District Court of the Ninth Judicial District of Montana (1971), 400 U.S. 423, 429, 91 S.Ct. 480, 483, 27 L.Ed.2d 507, 511 (holding that absent the consent of the tribe in accordance with Public Law 280 and affirmative legislative action by the state, the tribe has exclusive jurisdiction over a debt collection action arising out of a transaction on the reservation between a non-Indian creditor and an Indian defendant).

¶ The Montana Supreme Court has consistently applied and confirmed the holdings in Williams and Kennerly. Based in part upon the test articulated in Williams, this Court has outlined a three-part test for determining whether the state courts of Montana have jurisdiction over transactions occurring on the reservation. In State ex rel. Iron Bear v. District Court (1973), 162 Mont. 335, 346, 512 P.2d 1292, 1299, we stated:

> Before a district court can assume jurisdiction in any matter submitted to it, it must find subject matter jurisdiction by determining: (1) whether the federal treaties and statutes applicable have preempted state jurisdiction; (2) whether

the exercise of state jurisdiction would interfere with reservation self-government; and (3) whether the Tribal Court is currently exercising jurisdiction or has exercised jurisdiction in such a manner as to preempt state jurisdiction.

See also Marriage of Skillen, ¶ 46 (holding that in jurisdictional disputes between tribal and state courts, the Iron Bear test and a traditional sovereignty analysis apply in the adjudicatory context).

¶ **In accordance with Williams and Kennerly and the three-part test outlined in Iron Bear, this Court has held that the Montana courts have no subject matter jurisdiction over a debt collection action such as the one in this case, which arises on an Indian reservation and is brought by a non-Indian creditor against an enrolled member of the tribe residing on the reservation. See Geiger, 233 Mont. at 21, 758 P.2d at 281; Security State Bank v. Pierre (1973), 162 Mont. 298, 305, 511 P.2d 325, 329-30. In both Geiger and Pierre, this Court held that state court jurisdiction over such an action would interfere with tribal sovereignty and tribal self-government. Geiger, 233 Mont. at 21, 758 P.2d at 281; Pierre, 162 Mont. at 305, 511 P.2d at 329-30.**

¶ **Balyeat contends that even though Beverly is a member of the Tribes and resides on the reservation and even though the transaction arose on the reservation, state court jurisdiction will not interfere with tribal self-government, because the Tribes consented to share concurrent jurisdiction with the state courts in this area of law pursuant to Public Law No. 280, 18 U.S.C. §§ 1161-62, 25 U.S.C. §§ 1321-1326, 28 U.S.C. § 1360. Enacted in 1953, Public Law 280 provides a procedure whereby states may assume concurrent jurisdiction over civil causes of action to which a tribal member is a party and which arise within the boundaries of an Indian reservation. Pub.L. 280, 28 U.S.C. § 1360. While six states assumed jurisdiction under the statute's express terms, other states, including Montana, were entitled to unilaterally "assume jurisdiction at such time and in such manner as the people of the State shall, by affirmative legislative action, obligate and bind the State to assumption thereof." Pub.L. 280, § 7, 67 Stat. 588, 590 (1953). Pursuant to the 1968 Indian Civil Rights Act, Congress subsequently repealed the provision which authorized the states to unilaterally assume jurisdiction, and thereafter required the consent of the majority**

of the adult tribal members before the state could assume jurisdiction. 25 U.S.C. §§ 1322, 1326. See also In re Marriage of Wellman (1993), 258 Mont. 131, 136-37, 852 P.2d 559, 562 (briefly outlining history of Public Law 280); State ex rel. McDonald v. Dist. Court (1972), 159 Mont. 156, 159-160, 496 P.2d 78, 80-81 (same).

¶ Although consent of the tribal members was thus not required by Public Law 280 prior to the enactment of the 1968 Indian Civil Rights Act, Montana nevertheless established a consent procedure in 1963 for extending its civil adjudicatory powers onto the reservation. See Mont.Sess.Laws, Ch. 81, 1963, now codified at §§ 2-1-301 through 2-1-306, MCA. Subsequently, in 1965, the Confederated Salish and Kootenai Tribes enacted Tribal Ordinance 40-A (Revised) pursuant to which the Tribes consented to the assumption of enumerated areas of civil jurisdiction by the state courts of Montana onto the Flathead Reservation. In accordance with § 2-1-302, MCA, the governor of Montana thereafter issued the required proclamation dated October 8, 1965. Pursuant to Public Law 280 and Tribal Ordinance 40-A (Revised), the laws and jurisdiction of the state of Montana were thereby extended onto the Flathead Reservation in the following areas:

(a) Compulsory School Attendance

(b) Public Welfare

(c) Domestic Relations (except adoptions)

(d) Mental Health, Insanity, Care of the Infirm, Aged and Afflicted

(e) Juvenile Delinquency and Youth Rehabilitation

(f) Adoption Proceedings (With consent of the Tribal Court)

(g) Abandoned, Dependent, Neglected, Orphaned or Abused Children

(h) Operation of Motor Vehicles upon the Public Streets, Alleys, Roads and Highways

(i) All Criminal Laws of the State of Montana; and all Criminal Ordinances of Cities and Towns within the Flathead Indian Reservation.

¶ In determining whether Tribal Ordinance 40-A (Revised) extends jurisdiction over this case, we keep in mind several rules of statutory construction. In general, the role of this Court has always been "to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted." Section 1-2-101, MCA. Statutory language must be construed according to its plain meaning and if the language is clear and unambiguous, no further interpretation is required. Lovell v. State Comp. Mut. Ins. Fund (1993), 260 Mont. 279, 285, 860 P.2d 95, 99. Only when the language is ambiguous does the Court apply rules and principles of statutory interpretation. When construing Indian law, the canon of construction applied by the courts for over a century and a half has been to resolve all doubtful expressions in favor of Native Americans. Worcester v. Georgia (1832), 31 U.S. (6 Pet.) 515, 8 L.Ed. 483; Antoine v. Washington (1975), 420 U.S. 194, 199, 95 S.Ct. 944, 949, 43 L.Ed.2d 129, 134. See also In re Marriage of Skillen, ¶ 106 (Nelson, J., concurring in part and dissenting in part).

¶ In this case, however, this Court is not asked to simply interpret a state or federal statute that applies to Native Americans, but we are asked to interpret an ordinance that was promulgated by the Tribes themselves. Hence, it is even more imperative that we afford every deference to the Tribes and resolve all ambiguities in its favor. This is particularly so in this case. The ordinance we are asked to construe is one whereby the Confederated Salish and Kootenai Tribes *voluntarily* consented to the extension of jurisdiction to the Montana courts in very limited areas. Absent the clearest evidence of the Tribes' intent to consent to the assertion of authority by state courts onto their sovereign land, the Tribes retain their exclusive jurisdiction.

¶ For that very reason, this Court has thus held Tribal Ordinance 40-A (Revised) must be strictly construed so as not to extend state court jurisdiction beyond that expressly directed by the Tribes. Liberty v. Jones (1989), 240 Mont. 16, 19, 782 P.2d 369, 371. In Liberty, the Court declined to construe the term "public welfare" in the ordinance so broadly as to include state court jurisdiction in cases that affected the general happiness, well-being and welfare of the citizens of Montana. Instead we strictly limited it to the "practical issues of economic assistance to the needy." Liberty, 240 Mont. at 19, 782 P.2d at 371. We stated that "[i]n the absence of an express directive giving the State jurisdiction over disputes between tribal members,

which arise on the reservation, Montana cannot extend its authority over such controversies." Liberty, 240 Mont. at 19, 782 P.2d at 371 (emphasis added). Similarly, in this case, the state court does not have jurisdiction over the debt collection action absent an express Tribal directive.

¶ A review of Tribal Ordinance 40-A (Revised) reveals that the Tribes have not consented to concurrent jurisdiction over debt collection actions or indeed any commercial activities. In none of the enumerated areas, did the Tribe expressly agree to such an extension. Moreover, on this point, our holdings in Pierre and in Geiger are dispositive. As in this case, in both Pierre and Geiger, the debtors were members of the Confederated Salish and Kootenai Tribes and in both cases the commercial transaction occurred on the Flathead Reservation. Tribal Ordinance 40-A (Revised) thus required interpretation. In Pierre, we examined Tribal Ordinance 40-A (Revised) and implicitly held that the ordinance did not extend jurisdiction over the debt action to the Montana courts. Pierre, 162 Mont. at 304, 511 P.2d at 329. See also Larrivee, 184 Mont. at 201, 602 P.2d at 570-71 (examining Pierre and noting that "a commercial transaction is not one of the subjects over which the state assumes jurisdiction through Tribal Ordinance 40-A (Revised)"). Similarly, in Geiger, we noted that the Tribes had not consented to the assumption by the state of jurisdiction over commercial debt transactions occurring on the Flathead Reservation. Geiger, 233 Mont. at 20, 758 P.2d at 280. In both cases, the Court thus held that the state court lacked subject matter jurisdiction because the exercise of such jurisdiction would interfere with tribal sovereignty and the Tribes' right of self-government. Pierre, 162 Mont. at 305, 511 P.2d at 329-30; Geiger, 233 Mont. at 21, 758 P.2d at 281.

¶ Although the Tribes did not expressly consent to the extension of jurisdiction in debt actions, Balyeat nevertheless contends that the action relating to the debts incurred at St. Luke's can be litigated in state court pursuant to sections (d) and (c) of Tribal Ordinance 40-A (Revised). Again, we disagree.

¶ First, Balyeat cites Liberty, 240 Mont. at 18, 782 P.2d at 371, and argues that section (d) of the ordinance extends jurisdiction to the Montana courts in the area of "Medical Health." It contends that because this action involves debts incurred at a medical institution, the state court thus has jurisdiction. Balyeat's position is wholly without merit.

¶ As Beverly has pointed out in her papers and as the District Court pointed out in its decision, Balyeat relies on a typographical error in the <u>Liberty</u> opinion. That opinion misquotes section (d) as extending jurisdiction to the state in the area of "Medical Health," whereas section (d) actually extends jurisdiction in the area of "Mental Health." <u>See</u> <u>also Pierre</u>, 162 Mont. at 304, 511 P.2d at 329 (correctly quoting Tribal Ordinance 40-A (Revised)). Thus, the very premise upon which Balyeat's argument is based is flawed.

¶ Balyeat also argues that the matter may be litigated in state court pursuant to section (c), which extends concurrent jurisdiction to the state in the area of "Domestic Relations (except adoptions)." Tribal Ordinance 40-A (Revised). Balyeat points to §§ 40-2-106, -205 through -207, and -210, MCA, and argues that under Montana law a person is liable for the necessary expenses of her spouse, including medical expenses. Specifically, § 40-2-106, MCA, provides:

> **Liability for acts or debts of spouse.** Neither husband nor wife, as such, is answerable for the acts of the other or liable for the debts contracted by the other; provided, however, that the expenses for necessaries of the family and of the education of the children are chargeable upon the property of both husband and wife, or either of them, and in relation thereto they be sued jointly or separately.

Section 40-2-210, MCA, defines "necessary articles" to include services that are "reasonably required to provide for the health . . . of the married person. . . ." Balyeat reasons that these statutory sections fall within Montana's "domestic relations" law. It concludes that the Tribes therefore consented to extend jurisdiction to the Montana courts to litigate actions pursuant to those statutory sections. Hence, the state court has jurisdiction over its claim that Beverly is liable to it for the debts incurred by Lyle. We reject Balyeat's contention.

¶ The sole argument advanced by Balyeat in support of its position rests with its contention that § 40-2-106, MCA, falls within Montana's "domestic relations" law. That statute in fact falls within Title 40, entitled "Family Law," chapter 2, entitled "Husband and Wife." However, what is at issue is not whether that statute is contained within Montana's conception of what constitutes "domestic relations," but rather whether that statute falls within the Tribes' definition of "domestic relations." We conclude that it does not.

¶ Regardless of whether or not Montana considers § 40-2-106, MCA, to be part of its so-called "domestic relations" body of law, Balyeat offers no evidence of what the Tribes themselves intended by the term. It is evident that the Tribes certainly did not intend the term to be co-extensive with Chapter 2 of Title 40, "Husband and Wife," because that would exclude the areas of marriage and termination of marriage, which are embodied in chapters 1 and 4 of Title 40 but yet are certainly within the common definition and plain meaning of "domestic relations." Additionally, Balyeat offers no evidence that the Tribes intended the term "domestic relations" to be co-extensive with Montana's entire "Family Law" title. If the Tribes had so intended, they should have expressly so stated.

¶ Furthermore, it makes no sense that the Tribes intended to extend jurisdiction to the State in a case such as this. Such an interpretation would render all Tribal members subject to state court jurisdiction in actions to collect the debts for necessaries incurred by the spouse on the reservation, even in cases where a tribal-member spouse *who actually incurred the debt* is beyond the reach of state court jurisdiction.

¶ This case at heart remains a debt collection action. Even though Montana has codified § 40-2-106, MCA in its family law title, we decline to interpret "domestic relations" in Tribal Ordinance 40-A (Revised) so broadly as to include a debt collection action against a spouse. Absent an express directive giving the State jurisdiction over such a dispute, we strictly limit the term "domestic relations" to its plain and ordinary meaning.

¶ Because the Tribes have not agreed to extend jurisdiction over this matter to the state courts pursuant to Public Law 280 and Tribal Ordinance 40-A (Revised), we conclude that state court jurisdiction would interfere with tribal sovereignty. We hold that the Montana courts do not have jurisdiction over this action against Beverly to collect on the debt Lyle incurred on the reservation at St. Luke's.

## ISSUE THREE

¶ Do the state courts of Montana have subject matter jurisdiction over an action to collect a debt for medical bills arising out of transactions that occurred off the Flathead Reservation but within the State of Montana, brought by a non-Indian creditor against an enrolled member of the Confederated Salish and Kootenai Tribes who resides on the

No

reservation and whose spouse incurred the debt?

¶ As elaborated earlier, the state courts have no authority to exercise jurisdiction over commercial activities arising on the reservation involving a tribal-member defendant, because to do so would infringe on the right of the tribe to govern itself. See, e.g., Williams, 358 U.S. at 223, 79 S.Ct. at 272, 3 L.Ed.2d at 255; Geiger, 233 Mont. at 21, 758 P.2d at 281. In general, however, when tribal members reach beyond the confines of reservation boundaries to engage in commercial activities, they are deemed to have submitted themselves to the laws of the state and are thus subject to state court jurisdiction. Mescalero Apache Tribe v. Jones (1973), 411 U.S. 145, 148-49, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114, 119 ("Absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the state."); Little Horn State Bank v. Stops (1976), 170 Mont. 510, 515-16, 555 P.2d 211, 214 (noting that when "tribal members elect[] to leave the reservation and conduct their affairs within the jurisdiction of the state courts," subject matter jurisdiction "lies with the state court, not the tribal court."), cert. denied, 431 U.S. 924, 97 S.Ct. 2198, 53 L.Ed.2d 238 (1977). This Court has thus held that the Montana state courts have jurisdiction over transactions involving a tribal member, when that transaction involved "'significant contacts' with the state outside reservation boundaries." Crawford v. Roy (1978), 176 Mont. 227, 230, 577 P.2d 392, 393. In State ex rel. Flammond (1980), 190 Mont. 350, 352, 621 P.2d 471, 472, we again stated that "Montana may not exercise subject matter jurisdiction over transactions arising on Indian reservations unless the transaction entails 'significant' or 'substantial' contacts with the state outside of reservation boundaries."(internal citations omitted).

¶ In this case, Balyeat contends that the state court has jurisdiction over that portion of the action that relates to debts Lyle incurred at Rittenour Medical Clinic and at Community Medical Center, because those institutions are located outside the exterior boundaries of the reservation and all medical care was thus provided outside the reservation boundaries. In short, it argues that the transactions at those institutions entailed "significant" or "substantial contacts" with the state.

¶ There is no doubt that if this were an action against Lyle, Lyle would be subject to state court jurisdiction. By going beyond the confines of the reservation to receive

such medical care he established substantial contacts with the state and is thus deemed to have submitted himself to the laws and jurisdiction of the state of Montana. However, this is an action against Beverly, not Lyle. What is at issue is thus whether Beverly herself has established "significant" or "substantial" contacts with the state. We examine the transactions at each institution individually.

## A. Rittenour Medical Clinic

¶ With regard to the transaction at Rittenour Medical Clinic, Beverly herself engaged in absolutely no off-reservation acts that would vest the state court with jurisdiction over that portion of the debt action. Lyle alone received medical care and Lyle alone incurred the debts. Balyeat fails to identify any contacts, let alone "substantial" contacts, engaged in by Beverly which would subject her to the state court's jurisdiction.

¶ Instead of identifying any off-reservation contacts, Balyeat once again contends that Beverly is liable for Lyle's debts pursuant to § 40-2-106, MCA. The record is not clear as to whether Beverly and Lyle were married on the reservation or off the reservation, but Balyeat does not base its argument upon the location of the marriage ceremony. Instead, Balyeat argues that the mere fact that Beverly is married to Lyle is enough to subject her to the jurisdiction of the Montana courts. It cites McQuay v. McQuay (1930), 86 Mont. 535, 539, 284 P. 532, 533, and argues that § 40-2-106, MCA, creates an agency between spouses. According to Balyeat, when Lyle incurred debts for medical care he received off-reservation, his off-reservation contacts constituted "substantial contacts" with the state courts, which in turn were immediately imputed to Beverly as his agent. She thus became obligated to pay for them at the moment Lyle incurred them. Once again, we reject Balyeat's contention.

¶ The logic behind Balyeat's argument is missing an important step. Assuming § 40-2-106, MCA, does indeed apply to members of the Confederated Salish and Kootenai Tribes who reside on the reservation, then Balyeat may be correct in arguing that Lyle's off-reservation transactions (which would then be imputed to Beverly) constitute "substantial contacts" with the State so as to subject Beverly to the jurisdiction of the state court. However, Balyeat fails to cite any legal authority or provide any analysis to explain how or why § 40-2-106, MCA, applies to a tribal member living on the reservation in the first instance or whether § 40-2-106, MCA, somehow independently confers jurisdiction with the state court. It is our view that

the off-reservation contacts engaged in by Lyle, cannot also be used to bootstrap Beverly into state court when she herself has done nothing to submit herself to state court jurisdiction. Rather, we must first determine whether § 40-2-106, MCA, independently applies to members of the Tribes residing on the reservation. Only then do Lyle's contacts outside the reservation boundaries become relevant.

¶ We conclude that § 40-2-106, MCA, neither applies to Tribal members residing on the reservation nor somehow independently confers the state court with jurisdiction. A contrary holding would interfere with tribal sovereignty. As we elaborated previously, the courts have repeatedly recognized "the Federal Government's longstanding policy of encouraging tribal self-government." Iowa Mutual Insurance Company v. LaPlante (1987), 480 U.S. 9, 14, 107 S.Ct. 971, 975, 94 L.Ed.2d 10, 18 (citations omitted). Aspects of sovereignty include the tribe's right to exercise authority over not only its land but also its members. Iowa Mut. Ins. Co., 480 U.S. at 14, 107 S.Ct. at 975, 94 L.Ed.2d at 18 (The policy of encouraging tribal self-government reflects the fact that Indian tribes retain "'attributes of sovereignty over both their members and their territory. . . .'")(citation omitted).

¶ This Court has also emphasized the sovereign right of tribes to govern members who reside on the reservation, most recently in In re Marriage of Skillen. In that case, we declined to jeopardize a tribe's political integrity and its authority to exercise exclusive jurisdiction over a resident Indian child in a domestic case, even though the child may have significant off-reservation contacts through a non-Indian parent. We stated that "sovereignty must include at least the right to exercise authority over members within tribal boundaries." In re Marriage of Skillen, ¶ 61. Furthermore, it is well-settled that tribes retain this sovereign right over tribal members and their land where the Congress has failed to its assert its authority. As we pointed out earlier in this opinion, the state courts may take no action that undermines the authority of a tribe to govern itself. Williams, 358 U.S. at 220, 79 S. Ct. at 271, 3 L.Ed.2d at 254; State ex.rel.Iron Bear, 162 Mont. at 346, 512 P.2d at 1299.

¶ In this case, there is no doubt but that forcing Beverly to defend herself in state court pursuant to § 40-2-106, MCA, would infringe on the Tribes' sovereignty over its members and undermine its authority to govern its own affairs. Beverly is a tribal member who has resided within the exterior boundaries of the Flathead Indian Reservation her entire life. She works on the reservation for an entity owned by the

Tribes, and all her assets are located on the reservation. She has done nothing personally to avail herself of state law and state court jurisdiction; she has taken no action by which she could have reasonably expected to be haled into state court. Subjecting Beverly to a forum other than the one the Tribes established for themselves risks the potential for conflicting judgments as to whether there is a spousal agency between her and Lyle so as to render her liable for Lyle's medical debts. This in turn will result in a corresponding decline both in the authority of the Tribes to enact their own laws governing the relationship between spouses for purposes of liability and debt actions and in the authority of the Tribes to adjudicate disputes involving their members residing on their land.

¶ Furthermore, as we pointed out earlier, pursuant to the 1968 Indian Civil Rights Act, and §§ 2-1-301 through 2-1-306, MCA, the Montana courts have jurisdiction only over those areas of law to which the tribal members expressly consent. As we held earlier, the Tribes did not agree to extend jurisdiction to the state courts over debt collection actions against a spouse who is a member of the Tribes residing on the reservation pursuant to Public Law 280 or Tribal Ordinance 40-A (Revised). Asserting state court jurisdiction over Beverly pursuant to an area of law to which the Tribes did not consent, when Beverly herself took no steps to subject herself to the state court's jurisdiction, would essentially amount to an unlawful, unilateral assumption of jurisdiction in violation of both state and federal law.

¶ In sum, we hold that the state court does not have jurisdiction over the action against Beverly to collect the debts incurred by Lyle at Rittenour Medical Clinic, because § 40-2-106, MCA, does not apply to members of the Tribes residing within the external boundaries of the reservation or independently confer the state courts with jurisdiction, and because Beverly did not engage in significant or substantial contacts with the state outside the boundaries of the reservation.

B. Community Medical Center

¶ With regard to the transactions at Community Medical Center, Balyeat argues that Beverly engaged in substantial off-reservation contacts so as to vest the state court with jurisdiction over that portion of the debt collection action. Specifically, it identifies a document signed by both Lyle and Beverly on February 7, 1992, which pertains to at least some of Lyle's medical bills at that institution. The document is labeled "Community Hospital Inpatient Account Policies." The top portion of the

document contains the heading "payment plans" and requests that the patient choose from one of the payment plans listed. In this case, Lyle requested an extended time payment plan. The document then outlines the finance charge applied after 60 days from the date the patient is discharged, along with other terms. The middle of the document contains a box labeled "Release of Information - Financial Agreement - Assignment of Insurance and Medicare Benefits." Among the terms printed in this box, the document provides that "I also understand that I am responsible for all charges incurred regardless of insurance or third party liability. . . ." and "Should I not pay this account as due, I will be liable for any court, attorney or collection fees incurred by Community Medical Center in collection of any balance due on the account for services rendered."

¶ Balyeat characterizes this document as a contract, and argues that by signing it along with Lyle, Beverly engaged in a commercial transaction which constitutes a significant contact with the state. Beverly, on the other hand, states that it is not a contract, and alternatively characterizes it as an "admission document" or an "account stated." Although each party characterizes it in a light most favorable to the argument it advances, neither party actually briefs the issue as to whether or not it is a legal contract that obligates Beverly to pay for Lyle's debts, and the record contains no evidence explaining the document or describing the circumstances under which it was signed.

¶ Similarly, the District Court simply referred to the document as a "financial agreement for the payment of medical services provided to her husband," and stated it was a "minimal off-reservation contact." However, it made no findings of fact regarding the circumstances under which it was signed, and no conclusions of law as to whether it was a binding contract subjecting Beverly to liability.

¶ Whether or not this document constitutes a binding off-reservation commercial transaction entered into by Beverly is crucial to a determination as to whether her signature on this document constitutes a significant contact. However, the Court is unable to determine whether or not this document is indeed such a contract as Balyeat suggests.

¶ As the plaintiff in this debt collection action, it is Balyeat who bears the burden of proving that Beverly entered into a binding off-reservation contract to pay for Lyle's debts and that she thereby engaged in a significant contact with the state. It failed to

**carry this burden. It failed to develop a factual record below to explain the document and the circumstances under which Beverly signed it, and it failed to cite and argue legal authorities which would establish that the document on its face constitutes a binding contract.**

**¶ Accordingly, this Court holds that Balyeat failed to prove that Beverly engaged in significant off-reservation contacts so as to subject her to the state court's jurisdiction. We hold that the state court does not have jurisdiction over the action against Beverly to collect the debts incurred by Lyle at Community Medical Center.**

**¶ Affirmed.**

/S/ WILLIAM E. HUNT, SR.

We Concur:

/S/ W. WILLIAM LEAPHART

/S/ JAMES C. NELSON

/S/ TERRY N. TRIEWEILER

/S/ KARLA M. GRAY